**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Akwasi Damoah Asumadu, | No. CV-18-01418-PHX-DLR |
| Petitioner, | **ORDER** |
| v. | |
| Hannah Boahemaa Baffoe, | |
| Respondent. | |

Petitioner Akwasi Damoah Asumadu has filed a Verified Petition for Return of Children under the Hague Convention. (Doc. 1.) Respondent Hannah Boahemaa Baffoe opposes the petition. The Court held a bench trial on July 31, 2018. For the following reasons, Asumadu's petition is granted in part and denied in part.

**I. Background**

Asumadu and Baffoe were both born in Ghana. Asumadu immigrated to Canada in 1995 and presently is a Canadian citizen. Baffoe immigrated to the United States in 2004 and is a United States citizen. In 2005, the couple began a long-distance relationship. Although the couple lived apart for the majority of their relationship, Baffoe periodically traveled to Canada to visit Asumadu and visa-versa. In September 2016, Baffoe relocated to Canada, where she lived with Asumadu until returning to the United States in January 2018.

Asumadu and Baffoe have two children together. Their son, K.A.A., was born on

February 6, 2008, and their daughter, A.K.A., was born on July 20, 2011. Both children were born in the United States.

K.A.A. lived in the United States with Baffoe until January 2010, when he moved to Canada to live with Asumadu. Although the parties dispute the intended permanency of K.A.A.'s trip to Canada, it is undisputed that K.A.A. has lived there since January 2010. Baffoe contends that between 2010 and 2015 she made three unsuccessful trips to Canada to retrieve K.A.A. and return him to the United States. Baffoe testified that her efforts were thwarted by her fears of violent and physical retribution by Asumadu. Baffoe, however, failed to take any legal action to have K.A.A. returned, testifying that doing so would be contrary to Ghanan custom and cultural norms. According to Baffoe, consistent with these cultural norms, she sought assistance from Asumadu's parents and the elders of their village in Ghana. She was instructed to be patient. Years of that approach proved unsuccessful.

A.K.A., on the other hand, always lived in the United States with Baffoe. In 2016, Baffoe was in contact with Asumadu's father, who advised her that Asumadu had changed and promised that if she joined Asumadu in Canada he would not mistreat her. In September 2016, Baffoe and A.K.A. made the trip to Canada. According to Baffoe, her plan was to give Asumadu a chance to prove that he would not be abusive. If he behaved, Baffoe intended to stay; if not, she intended to return to the United States with both children. Baffoe claims that, upon her arrival in Canada, she immediately discovered that K.A.A. had suffered an untreated serious head injury. In support, she offered a picture K.A.A.'s head showing a small scarred area.

Baffoe, Asumadu, and their two children resided together in Canada from September 2016 until January 2018. During that period, Baffoe testified that there were three serious incidents of domestic disturbance arising out of seemingly minor disagreements.

Baffoe claims, and Asumadu denies, that in the first incident Asumadu hit her in the face because he thought she had diluted his cranberry juice with water. Asumadu

testified that he was not physically abusive and that it was Baffoe who was verbally abusive when he questioned her about diluting his juice. As a result of that incident, Asumadu went to his parent's home to spend the night, taking K.A.A. with him.

The second incident arose out of a dispute over Baffoe cooking fish. According to Baffoe, she called the police after being beaten and sustaining a back injury. The police visited and interviewed Asumadu, but issued no citation, made no arrest, and prepared no report. Sometime after the second incident, Baffoe sought medical care for her back but did not tell the provider that she had been beaten.

The third incident, according to Baffoe, involved Asumadu beating her with a belt and threatening her with a knife for sitting in his chair. Fearing further abuse from Asumadu, and lacking financial resources to leave, she continued to live with Asumadu. Asumadu denies the alleged third incident.

In January 2018, while Asumadu was at work, Baffoe left Canada for the United States with both children. She did not tell Asumadu she was leaving or where she was going. After Asumadu located Baffoe in Arizona, he filed a petition for return of his two minor children, K.A.A. and A.K.A., to Canada pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq., which implements the provisions of the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980) ("Hague Convention" or "Convention").

**II. Discussion**

The primary purpose of the Hague Convention is to deter parents from moving children across international borders to gain an advantage in custody disputes. *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). "A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child." *Id.* Instead, the court's role is limited to determining whether the petitioner has met the initial burden of showing, by a preponderance of the evidence, that removal or retention of the child was wrongful under the Convention. 22 U.S.C. § 9003(e)(1)(A); *Gonzalez v. Pena*, 194 F. Supp. 3d 897, 901

(D. Ariz. 2016). Only after such a showing does the burden shift to the respondent to demonstrate the applicability of any affirmative defenses. § 9003(e)(2). If no such defenses are applicable, the court must order return of the minor child to the country of habitual residence.

**A. Wrongful Removal**

The removal or retention of a child is considered "wrongful" where:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3, 19 I.L.M. at 1501. The only issue in dispute is which State the children habitually resided immediately prior to removal. (Doc. 39 ¶¶ 4-10.) Thus, if K.A.A. and A.K.A. habitually reside in the United States, then the Convention does not compel their return to Canada because they were neither "removed" from the state of habitual residence nor "retained" in another state. *Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004). Accordingly, the Court must first determine the habitual residence of each child.

Although the Convention does not define "habitual residence," courts look to the last shared and settled intent of the parents to determine which country is the "locus of the [child's] family and social development." *Mozes v. Mozes,* 239 F.3d 1067, 1084 (9th Cir. 2001). In *Mozes*, the Ninth Circuit set out a two-part inquiry. First, in order to acquire a new habitual residence, there must be a "settled intention to abandon the one left behind." *Id.* at 1075. Unsurprisingly, however, it is common for parents to disagree about their settled intent. "In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." *Id.* at 1076. Second, there must be (A) an actual change in

geography, combined with (B) the passage of an appreciable period of time sufficient for acclimatization. *Id.* The habitual residence inquiry is highly fact-specific and is dependent on the particular circumstances of each individual case. *Holder,* 392 F.3d at 1015.

Asumadu has not proven by a preponderance of the evidence that the parties had a shared intent for A.K.A. to habitually reside in Canada. After A.K.A. was born in July 2011, Baffoe and A.K.A. lived together in the United States until November 2015, when they visited Petitioner for ten to eleven weeks. Baffoe and A.K.A. made the 2015 visit and returned without abandoning their residence in the United States. The two made another lengthy trip to Canada in September 2016 on a trial basis. The Court credits Baffoe's testimony that it was not her intent to make Canada her and A.K.A.'s permanent home unless and until she was convinced that Asumadu no longer would be abusive. Shortly after living with Asumadu during this trip, Baffoe concluded that he had not changed and began planning her return to the United States. Although she lived in Canada for more than a year, there was never a shared intent for A.K.A. to live anywhere other than with Baffoe. As such, A.K.A.'s habitual residence remained the United States. Because Asumadu has not proven by a preponderance of the evidence that A.K.A.'s habitual residence was Canada, his petition must be denied as to this child. *See Papakosmas v. Papakosmas*, 483 F.3d 617, 621 (9th Cir. 2007).

Asumadu has proven, however, that the parties had a shared intent for K.A.A. to habitually reside in Canada. For example, in January 2010, Asumadu travelled to the United States and moved K.A.A. to Canada. K.A.A. lived in Canada with Asumadu for eight years until he was removed by Baffoe in 2018. Although Baffoe contends that Asumadu moved K.A.A. to Canada without her consent, the evidence does not support her contention. For instance, Baffoe signed an authorization for Asumadu to receive the Canadian tax benefit because K.A.A. lived with him in Canada. Baffoe also visited Canada multiple times after K.A.A. moved there, but until 2018 always returned to the United States without him. Nor did she inform law enforcement or file a petition under

the Hague Convention seeking return of K.A.A. to the United States. *Moreno v. Zank*, 895 F.3d 917, 924-925 (6th Cir. 2018) ("[I]f Convention procedures are not fully pursued when a child is first abducted, it makes little sense to categorically permit later self-help abduction in the other direction, after the child has been acclimatized in the second country."). Instead, Baffoe first raised her alleged lack of consent in the context of this proceeding, eight years after K.A.A. moved to Canada. The Court therefore finds that the parties agreed in 2010 for K.A.A. to live in Canada with Asumadu and that his habitual residence is Canada.

### B. Exceptions

Even when a petitioner establishes a *prima facia* case of wrongful removal, as Asumadu has done with K.A.A., the Court may decline to order the child's return if certain "narrow" exceptions are satisfied. Convention, art. 13, 19 I.L.M. at 1502-03. Here, Baffoe argues two such exceptions apply.[1]

#### i. Grave Risk

First, Baffoe raises the grave risk exception, which provides that the Court "is not bound to order the return of the child if . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id*. at 13(b), 19 I.L.M. at 1502. The party raising this exception must prove by clear and convincing evidence that returning the child to his habitual residence would expose him to physical or psychological harm or otherwise place him in an intolerable situation. *Gonzalez*, 194 F. Supp. 3d at 901.

In evaluating whether returning K.A.A. to Canada would present a "grave risk" of physical or psychological harm to the child, the Court is not tasked with deciding whether Asumadu is a suitable father, a good spouse, or even whether K.A.A. would fare better with Baffoe. Under this exception, the word "grave," means likely to produce great harm or danger. *Aguilera v. De Lara*, No. 14-CV-1209-PHX-DGC, 2014 WL 3427548, at *3 (D. Ariz. July 15, 2014). The State Department distinguishes "grave" from "serious."

---

[1] During the bench trial, Baffoe withdrew her "mature child's objection" defense.

Hague International Child Abduction Convention, 51 Fed. Reg. 10,510 (Mar. 26, 1986) ("The person opposing the child's return must show that the risk to the child is grave, not merely serious."). The grave risk exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Goudin v. Remis,* 415 F.3d 1028, 1035 (9th Cir. 2005); *see also Cuellar,* 596 F.3d at 509.

Baffoe claims that Asumadu's threats and acts of violence toward her committed in the presence of the children demonstrate that the children would be exposed to a grave risk of physical or psychological harm. Though there was no corroborative evidence of domestic violence (i.e., photographs of injuries, police reports, or medical records), the parties' testimony and the investigation by Dr. Phillip Stahl—the parties' jointly retained forensic psychology evaluator—indicate that Asumadu and Baffoe poorly manage their differences and conflicts. For example, Dr. Stahl opined that, "rather than a historically lengthy pattern of Coercive Control with threats of harm, it appears most likely that this couple had a very poor ability to manage their differences and conflicts, that [Baffoe] was angry and often withdrew, and that [Asumadu] was angry and would alternate between withdrawing and acting aggressively toward [Baffoe]. When overwhelmed by [Baffoe's] accusations and hatred of living in Canada, [Asumadu] was at greatest risk of acting aggressively towards her." (Ex. 49 at 32.)

Despite the lack of corroborative evidence, the Court, much like Dr. Stahl, finds the description of events provided by Baffoe is consistent with her having been the victim of some form of domestic violence. It is difficult to determine the full nature of the violence, but the Court finds Asumadu likely struck Baffoe on more than one occasion. The Court, however, does not find the allegation that Asumadu put a knife to Baffoe's throat credible.

Nevertheless, physical abuse or threats towards a spouse are not the same as physical abuse or threats towards a child. *See Nunez Escudero v. Tice-Menley*, 58 F.3d 374, 375-78 (8th Cir. 1995); *Tabacchi v. Harrison*, No. 99-C-4130, 2000 WL 190576, at *12-16 (N.D. Ill. Feb. 10, 2000) ("Although [Petitioner's abusive] behavior toward his

wife is unacceptable, to qualify as a grave risk of harm under the convention, the risk must be to the child."). Given the narrowness of this exception, the Court cannot conclude that Asumadu's acts of violence against Baffoe satisfy the grave risk requirement under the Convention.

Baffoe also claims that K.A.A. allegedly suffered a significant head injury, Asumadu was neglectful for not having it treated medically, and Asumadu attempted to hide the head injury from Baffoe when she arrived in Canada in September 2016. In support of those allegations, Baffoe offered a picture of the back of K.A.A.'s head. (Ex. 44.) The exhibit however, shows what looks to be a small, benign scar on the scalp inside the hair. There is no evidence that K.A.A. suffered a significant head injury. Further, Dr. Stahl's report indicates that K.A.A. reported only that both parents are harsh with him when angry and that Asumadu had spanked him.

In sum, Baffoe has not proven by clear and convincing evidence that there is a grave risk that the return of K.A.A. would expose him to physical or psychological harm or otherwise place him in an intolerable situation.

### ii. Consent or Acquiescence

Next, Baffoe argues that the consent or acquiescence exception applies. Under this exception, the Court may decline to return a child wrongfully removed from his habitual residence if a parent was not actually exercising custody rights over the child at the time of removal or if the petitioner had consented to the removal of the child. *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005). Baffoe must prove consent or acquiescence to the removal by a preponderance of the evidence. *Id.* Although the Court's analysis focuses on the petitioner's subjective intent at the time of the removal or retention, "conduct after removal [or retention] can be useful in determining whether consent was present at the time of removal [or retention]." *Gonzalez-Caballero v. Mena,* 251 F.3d 789, 794 (9th Cir. 2001).

Baffoe asserts that Asumadu consented to her returning to the United States with the children in December 2017, one month prior to her moving with the children to

Arizona. The Court, however, finds that the parties' actions surrounding the removal are not consistent with a consensual removal of the children. For instance, Baffoe took the children while Asumadu was away at work; she did not tell him that she was leaving or where she and the children were going; after leaving she refused to answer or accept Asumadu's phone calls; and she attempted to prevent Asumadu from locating her and the children. Likewise, Asumadu's behavior following the removal is inconsistent with a consensual removal. For example, upon returning from work and finding that Baffoe, the children, and their belongings were gone, Asumadu tried reaching Baffoe on her cell phone. Efforts to reach Baffoe proving futile, Asumadu called the Canadian police for assistance. Based on this evidence, Baffoe has not shown by a preponderance of the evidence that Asumadu consented to K.A.A.'s removal to the United States from Canada.

Baffoe also offers evidence that Asumadu signed and notarized a form permitting K.A.A. to obtain a United States passport prior to his return to the United States. The Court, however, credits Asumadu's trial testimony that he did not consent to permanent removal of K.A.A. to the United States. At most, Asumadu's authorization reflects consent for K.A.A. to travel between the countries, not be permanently removed to the United States.

**III. Conclusion.**

As a reminder, in reaching its ruling the Court is not charged with deciding which party is a better parent, which location would be preferable, whether it is in the children's best interest to be separated, or who should have custody. *See* Convention, art. 19, 19 I.L.M. at 1503. The Court's decision is limited to determining whether the children were wrongfully taken and, if so, whether any exceptions to return apply.

Based on the Court's finding that A.K.A.'s habitual residence is the United States, Asumadu has not made the showing required under the Hague Convention for a mandatory return of A.K.A. to Canada. Based on the Court's finding that K.A.A.'s habitual residence is Canada and that Baffoe has not established by the requisite levels of proof that any of the narrow exceptions apply, Asumadu has made the showing required

for a mandatory return of K.A.A. to Canada.

Although the Court's findings will result in the separation of the children until the courts of the respective countries can resolve custody issues, the decision to separate the children's habitual residences was one previously made by the parties themselves—the children have lived apart for all but fifteen months between September 2016 and January 2018. Accordingly,

**IT IS ORDERED** that Asumadu's Petition for Return of Children Under the Hague Convention (Doc. 1) is **GRANTED** as to K.A.A. and **DENIED** as to A.K.A.

**IT IS FURTHER ORDERED** that within **15 days** of this order, K.A.A. shall be returned to Canada, where he is to remain until custody proceedings in the Canadian courts have concluded.

The Clerk of the Court is directed to terminate this case.

Dated this 17th day of August, 2018.

Douglas L. Rayes
United States District Judge